**STATE of Missouri, ex rel. WICHITA FALLS GENERAL HOSPITAL, Relator,**

**v.**

**The Hon. George A. ADOLF, Judge of the Circuit Court of the City of St. Louis, Missouri, Respondent.**

No. 52539.

Missouri Court of Appeals, Eastern District, Division Two.

March 10, 1987.

Motion for Rehearing and/or Transfer Denied April 9, 1987.

Application to Transfer Denied May 19, 1987.

Joseph M. Kortenhof, St. Louis, for relator.

James F. Koester, St. Louis, for respondent.

SMITH, Judge.

Relator, Wichita Falls General Hospital, sought and obtained our preliminary order in prohibition to prevent respondent judge [1] from proceeding further against relator in the underlying lawsuit on the basis of a lack of personal jurisdiction.

Relator is a hospital incorporated under the laws of Texas with its principal place of business in Wichita Falls, Texas. It has no agents and does no business in Missouri. Southwest Organ Bank (SWOB) (not a party here or below) is a not-for-profit corporation in Dallas, Texas. It functions essentially as a clearing house for information concerning availability and need for human organs to be used for transplanting. When relator has organs available for transplant it notifies SWOB of that availability and SWOB, acting through a national network, notifies transplant facilities throughout the country of such availability. On March 20, 1986, relator advised SWOB of the availability from a deceased patient of a blood Type A heart suitable for transplant. By affidavit [2] relator asserted that it received

---

1. Attorneys representing plaintiff and co-defendants Barnes Hospital and Dr. Bolman have appeared separately on behalf of respondent and filed separate briefs.

2. This was the only affidavit before the trial court at the time of its decision on the motion to dismiss for lack of jurisdiction. In this court additional affidavits have been filed without objection.

no financial gain from making donor organs available, that such organs were made available as a humanitarian not-for-profit activity and that relator has no control over where the organs are sent. Barnes Hospital in St. Louis, and Dr. Bolman, a cardothoracic surgeon, were advised through SWOB of the availability of a transplantable blood Type A heart located at Wichita Falls General Hospital. Dr. Bolman had a patient, Robert Ottinger, in need of an A type donor heart for transplant. Dr. Bolman contacted relator by telephone to confirm the availability of the organ and then flew to Wichita Falls with a transplant team to harvest the organ. Upon completion of the harvest by Dr. Bolman and his team he returned to Barnes Hospital with the heart. From the time of Dr. Bolman's call, relator was aware of the intention to utilize the heart for transplant into a patient in St. Louis. There is no indication in the record that relator was aware of the geographic location of the potential transplant recipient prior to that call or that it had any contact with Barnes Hospital or any place in Missouri in regard to the donor heart prior to that call. It is not part of relator's business to solicit donor organs for distribution, but if such become available in the treatment of patients it advises SWOB of such availability.

Upon his return to Barnes Hospital, Dr. Bolman commenced transplantation of the heart into Ottinger. After removal of Ottinger's heart and shortly before completion of the operation, Dr. Bolman was advised that in fact the donor heart was a blood type B heart. Having no other heart available, Dr. Bolman completed the operation. After some time Ottinger began rejection of the heart and another transplant was performed with the correct type heart. That heart deteriorated after placement and Ottinger subsequently died. The suit below for wrongful death by Ottinger's widow followed. Relator, Barnes Hospital and Dr. Bolman were named as defendants. Relator was served pursuant to Sec. 506.-500 RSMo 1986, the Missouri Long-Arm statute. It filed its motion to dismiss for lack of personal jurisdiction which motion was denied. This proceeding followed.

Prohibition is the proper remedy to prevent further action of the trial court where personal jurisdiction of the defendant is lacking. *State ex rel. Boll v. Weinstein*, 365 Mo. 1179, 295 S.W.2d 62 (1956) [10–13].

For Missouri to obtain jurisdiction over a foreign defendant under Sec. 506.-500 RSMo 1986, two elements must be present. First the suit must arise out of the activities enumerated in that statute. Secondly, the defendant must have sufficient minimum contacts with Missouri to satisfy due process requirements. *Medicine Shoppe International, Inc. v. J–Pral Corp.* 662 S.W.2d 263 (Mo.App.1983) [14]. As to the first requirement our courts have held that "commission of a tortious act within this state" includes extra-territorial acts of negligence producing actionable consequences in Missouri. *State ex rel. Caine v. Richardson*, 600 S.W.2d 82 (Mo. App.1980); *State ex rel. Apco Oil Co. v. Turpin*, 490 S.W.2d 400 (Mo.App.1973). We can assume that the factual situation before us is sufficient to meet the statutory requirement of the commission of a tortious act in Missouri.

In *State ex rel. Deere & Co. v. Pinnell*, 454 S.W.2d 889 (Mo. banc 1970) it was held that the Missouri long-arm statute is intended to extend jurisdiction to the limits permissible under the due process clause of the Fourteenth Amendment. Obviously, it cannot extend beyond those limits. Our inquiry therefore must address jurisdiction over this relator in the context of due process.

The starting point for such an inquiry is *International Shoe Co. v. State of Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). That case established the use of a flexible standard in determining the requirements of personal jurisdiction by a state over foreign defendants. The test to be applied is whether the defendant, not being present in the jurisdiction, has "certain minimum contacts with it such that maintenance of the suit does not offend 'traditional notions of fair play and sub-

stantial justice.'" *Id.* 316, 66 S.Ct. at 158. The Court then went on to state:

"That clause [due process] does not contemplate that a state may make binding a judgment in personam against an individual or corporate defendant with which the state has no contacts, ties or relations ... .

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations; and, so far as those obligations arise out of or connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." *Id.* 319, 66 S.Ct. at 159.

The teaching of *International Shoe* has been refined over the years. In *Hanson v. Denckla,* 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the court emphasized that it is a mistake to assume that the trend evidenced by *International Shoe* heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. The Court there held that:

"The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Id.* 253, 78 S.Ct. at 1239.

In *Kulko v. Superior Court of California,* 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978), the court rejected the state court conclusion that where a nonresident defendant has caused an effect in the State by an act or omission outside the State, personal jurisdiction over the defendant arising from that effect may be exercised wherever "reasonable." In assessing the application of the minimum contacts test the facts in each case must be weighed to determine whether the requisite "affiliating circumstances" found missing in *Hanson v. Denckla* are present. *Id.* 92, 98 S.Ct. at 1696. The minimum contacts test requires that the defendant "purposefully availed himself" of the "benefits and protections" of the forum's laws. *Id.* 94, 98 S.Ct. at 1698.

The establishment of the requisite contacts is more easily met in a commercial setting. *McGee v. International Life Ins. Co.,* 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). There, marketing into the forum, either directly or indirectly, removes the unreasonableness of subjecting the corporation to suit. The "purposefully avails itself of the privilege of conducting activities within the forum State" test of *Hanson v. Denckla* is more easily found where the defendant seeks to obtain economic benefit through commercial activity, direct or indirect, in the state. But even in the economic context the exercise of jurisdiction is not unlimited. This was recognized in *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). In rejecting the contention that foreseeability alone is a sufficient benchmark for personal jurisdiction, the Court stated:

"This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.* 297, 100 S.Ct. at 567.

In *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528 (1985), the Court further addressed the purposeful availment test.

"This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts ... or of the 'unilateral activity of another party or third person,'

.... . Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." (Emphasis in original).

On February 24, 1987, the United States Supreme Court again addressed the due process restrictions in subjecting foreign corporations to jurisdiction of state courts. *Asahi Metal Industry Co. v. Superior Court of California,* — U.S. —, 107 S.Ct. 1026, 94 L.Ed.2d 92. That case deals solely with the area of product liability and non-U.S. companies and factually bears no resemblance to that before us. It is of some assistance nevertheless. First, it is clear from all opinions in that case that the minimal contacts required in the products liability area involving stream of commerce are less stringent than in other areas. Secondly, it is again emphasized in the various opinions that the basic due process test is whether defendant has taken an action purposefully directed toward the forum state. The difference between the three opinions is the degree to which injection of a product into the stream of commerce alone is sufficient to establish "purposeful availing." Finally, the case clearly establishes that the "traditional notions of fair play and substantial justice" language of *International Shoe* is a separate test, related to but not identical with the minimum contacts test. That portion of the opinion in which all justices concurred indicates that both tests must be met.

With this background from the United States Supreme Court, we turn to Missouri law. In the posture of this case that examination can be largely limited to the two cases entitled *State ex rel. Sperandio v. Clymer,* 568 S.W.2d 935 (Mo. banc 1978) (Sperandio I) and 581 S.W.2d 377 (Mo. banc 1979) (Sperandio II).

We do not find helpful the line of Missouri cases dealing with product liability because the General Assembly has by Sec. 431.069 RSMo 1986 specifically declared that procurement, processing, distribution or use of human organs or blood for transfusing or transplanting into the human body is, for all purposes, the rendition of a service and not a sale. This case therefore does not fit under the less stringent tests applied to products liability cases and the "stream of commerce."

The *Sperandio* cases involved a suit against a doctor in Utah who, upon request, rendered gratuitous advice to a Missouri physician concerning a prospective operation on a Missouri resident. In *Sperandio I,* the court upheld Long Arm jurisdiction. In so doing it found two "contacts" sufficient to satisfy due process. Those were: (1) Missouri's interest in securing redress for its citizen who was injured in Missouri and had no contact with Utah and (2) that the Utah doctor's acts° were performed for the purpose of causing an effect in Missouri. In reaching that conclusion the court found that the Utah doctor knew the information he conveyed would be utilized in Missouri to aid in performing an operation on a Missouri resident. In short the injury sustained by the Missouri resident in Missouri was foreseeable by the Utah doctor. Upon certiorari to the United States Supreme Court, 439 U.S. 812, 99 S.Ct. 69, 58 L.Ed.2d 103 (1978), the judgment in *Sperandio I* was vacated and the cause remanded "for further consideration in the light of" *Kulko, supra.* Upon remand the court in *Sperandio II* found an absence of sufficient minimum contacts to meet due process requirements. Relying upon *Kulko,* the court rejected the sufficiency as a minimum contact of defendant having caused an effect in Missouri. It *found rather that the Utah doctor had not purposefully availed himself of the privilege of conducting activities within the forum state so as to invoke the benefits and protection of its laws.* Respondent seeks to distinguish *Sperandio II* on the basis of a statement therein that the record did not establish that the Utah doctor knew his suggested technique would be followed (a finding directly contrary to the finding by the same court in *Sperandio I*). We do not consider that a valid distinction as the key element of *Sperandio II* is the absence of purposeful availing of benefit from his activities relating to Missouri, not his knowledge of the effects of his activities.

■ We turn to the facts before us. On those facts we are unable to find the requisite minimum contacts sufficient to satisfy due process requirements. By express statutory directive, we are dealing with a service, not a sale or a product. While not of particular importance we note that the negligence alleged occurred prior to any knowledge of Missouri involvement in the transplant. Relator initiated no contact with Missouri. The involvement with Missouri was initiated by third parties, Barnes Hospital and Dr. Bolman. Relator advised SWOB of the availability of an organ. That availability was to anywhere the need existed and relator made no determination of the geographic location of the recipient. The record demonstrates no history of contacts by relator with Missouri, no utilization of the benefits of the laws of Missouri, and no purposeful selection of Missouri as the recipient of the heart. The record demonstrates that the utilization of the organ in Missouri was foreseeable in the general sense that any state might receive it before contact by Dr. Bolman and foreseeable specifically thereafter. The record further establishes that supplying of the organ had an effect in Missouri. But, the contact with Missouri was "random" and "fortuitous" and was the result of the unilateral activity of Dr. Bolman and Barnes Hospital. Neither the foreseeability nor the effect nor both together is sufficient under the cases to establish "minimum contacts.

■ In affidavits filed in this court, but not before the trial court, certain facts have been presented establishing that money was received by relator as a result of supplying the organ. On the record before the trial court the only fact concerning money was the affidavit that relator received no financial gain for making the organ available. The parties appear to have tacitly agreed that we may consider the additional affidavits presented here, and in the interest of finally resolving this issue we will do so. SWOB paid the donor hospital for certain of its expenses in connection with the testing and preservation of the organ. In this case relator received $1,159.80 from SWOB. The amounts reimbursable under the agreement between relator and SWOB are less than the actual cost to relator for evaluating and maintaining the donor body and relator generally, and here specifically, sustains a financial loss as a result of involvement in the organ donor program. We are unable to conclude that these additional facts establish a commercial activity by relator. Relator is not in the business of selling organs. It makes available organs which fortuitously result from its treatment of patients. For its efforts in evaluating and maintaining the organs in transplantable condition, certain of its expenses are reimbursed by SWOB. Under the Missouri statute relator performed a service, it did not sell a product. It's activity does not under these facts constitute the type of commercial activity found in certain heretofore cited cases as establishing a "purposeful" availing of the benefits of the forum.

*Burger King Corporation v. Rudzewicez, supra,* and *Asahi Metal Industry Co. v. Superior Court, supra,* established that once it is decided that defendant purposefully established minimum contacts with the forum state those contacts may be considered with other factors to determine whether imposition of personal jurisdiction would comport with "fair play and substantial justice." We do not find that sufficient minimum contacts are present here to require exploration of additional factors. Consideration of such factors would not alter our result. The assertion most frequently pressed, and urged by respondent here, is the forum's interest in redress of its citizens injured within the state. That is certainly an important policy concern. But the state has an equally strong, if not stronger interest, in protecting the life and health of its citizens. Our decision does not preclude plaintiff below from recovery from relator. It relegates her to seek that recovery from the Texas courts. This is a matter of convenience. A holding subjecting relator to suit in Missouri could well have serious adverse effects upon Missouri residents rising far beyond inconvenience.

As this case makes clear the demand for donor organs exceeds the supply. Missouri is an important organ transplant center

and must seek its supply of those organs from throughout the country and possibly the world. Transplant surgery is still in its early years. By its nature it is high risk surgery and presumably the treatment of last resort in most cases. Because of its high risk and the possibility of lethal results if unsuccessful it has great potential as a source of malpractice litigation. The cases which come before us in the malpractice area reflect that generally in such actions every facility and doctor having any connection with the surgery or treatment performed is joined regardless how tenuous its or their culpability may be. Hospitals making organs available do so for moral and humanitarian reasons. We know of no legal requirement they do so and we know of no reason why they could not simply refuse to make transplantable organs available or limit the forums to which they will make them available. Negligence does occur in hospitals and erroneous blood typing occurs in even the best of hospitals. See *Barnes Hospital v. Missouri Commission on Human Rights*, 661 S.W.2d 534 (Mo. banc 1983). Hospital employees, as human beings, make mistakes, and the administrators of hospitals surely are aware of this. If the threat of having to defend a potential malpractice action, meritorious or otherwise, in a far distant jurisdiction serves to cause even one hospital to refuse to provide an organ necessary to keep a Missouri resident alive the results far outweigh the inconvenience of requiring Missouri residents to sue in the hospital's home forum. Missouri has restricted the availability of some tort concepts in some humanitarian medical treatment situations where human life is at stake. Sec. 537.037 RSMo 1986. We do not believe it in keeping with that public policy to place the convenience of Missouri residents in litigating above the interest of the public in having transplantable organs available. Respondent's argument that being subject to suit here may make hospitals more careful, is premised on the supposition that only negligent hospitals are subjected to malpractice suits in foreign jurisdictions. It overlooks the fact that when organs are supplied for humanitarian reasons the po-

tential of responding to foreign jurisdiction lawsuits may serve to terminate or reduce that supply to those jurisdictions. We are unable to conclude that imposition of personal jurisdiction over relator in Missouri would comport with "fair play and substantial justice."

Writ of prohibition made permanent. Respondent is directed to sustain the motion to dismiss of relator. Relator's motion to strike is denied.

SNYDER, C.J., and CARL R. GAERTNER, J., concur.